662 F.2d 637
 27 Fair Empl.Prac.Cas. 1175,
27 Empl. Prac. Dec. P 32,285
Louise T. MEYER and David C. Meyer, Plaintiffs-Appellants,
v.
CALIFORNIA AND HAWAIIAN SUGAR COMPANY, Robert O. Nagle,
Donald W. Hare, Donald T. Hanson and Donald
Martin, Defendants-Appellees.
 No. 79-4536.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 12, 1981.
Decided Nov. 30, 1981.
 
 Robin B. Johansen, Rosen & Remcho, San Francisco, Cal., for plaintiffs-appellants.
 Donald Connors, Jr., Brobeck, Phleger & Harrison, San Francisco, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before MARKEY,* Chief Judge, United States Court of Customs and Patent Appeals, and HUG and POOLE, Circuit Judges.
 POOLE, Circuit Judge:
 
 
 1
 Plaintiffs Louise and David Meyer appeal the summary judgment entered by the United States District Court for the Northern District of California in favor of defendant C&H Sugar Co. For reasons stated below, we affirm that judgment.
 
 FACTS
 
 2
 As of November 1977, Louise Meyer, a 57 year old woman, held the position of Administrative Assistant in the Personnel Department of California and Hawaiian Sugar Company ("C&H"). Meyer had worked for C&H for over 18 years. At the time of her discharge, she had significant responsibility for the administration of C&H's affirmative action program. During the summer of 1977, C&H had begun formulating a plan for posting job openings in its San Francisco office to improve promotion opportunities for all employees, including minorities. Meyer's supervisor, defendant Donald Hanson, asked for her thoughts on this matter.
 
 
 3
 About November 8, 1977, Meyer began to prepare a memorandum on this subject. After preparing and discarding several drafts, she placed a final version on Hanson's desk. She claims that the only copy of the final version was destroyed approximately one week later, and that Hanson did not criticize any of its contents when he read it on or about November 9.
 
 
 4
 The first version of the memorandum which she had discarded provided in part:
 
 
 5
 I worry quite a bit about some of our minorities specifia the Philippines and lord knows these the Pakistanis and Indi better to remain inexplicit about which ones but those who come from a poor very corrupt states countries. You'll probably aware that a college xxxxx xxxxx diploma is 'proof' to Immigration authorities that these people can earn a xxxx living here and, in fact, insures the treasured 'green card'. I would suspect that some of these can be bought and, in any event what is a B.S. in animal husbandry from upper Mongolia Tasmania worth xx on the job. I worry because it's happened that we are opening the door for to demands that these college degrees make it proper all sorts of professional jobs be given to these employees, some of whom are been e weak and had to be carried whi as less than marginal employees they while they picked up rudiments of business language and customs. This could be hard on our nonminority employees who also have been waiting in line for promotion and whose interests we should xxx respect too.[1]
 
 
 6
 Erlinda Felina, a minority employee, found two draft memoranda (the second is virtually identical to the first), either in Meyer's wastebasket or in the women's washroom. After discussing the contents of the memorandum, Felina and other minority employees called on defendant Nagle, President of C&H, to express their displeasure and concern. A series of top level C&H management meetings ensued.
 
 
 7
 After discussions with defendants Hare, Cavallina, and other members of C&H management, Nagle called Meyer to his office on November 15, 1977. She confirmed that she had written the memorandum and, according to Nagle's understanding, that the attitudes expressed were hers. Nagle then asked for her resignation.
 
 
 8
 Although Meyer complied readily with Nagle's request, she later felt dissatisfied with the treatment C&H had accorded her. She and her husband then brought this action charging age and sex discrimination, violation of the equal pay provisions of the Fair Labor Standards Act, retaliation, violation of Section 1985, invasion of privacy, infliction of emotional distress, wrongful discharge, intentional interference with advantageous relations, and loss of consortium. After completion of discovery, the district court granted summary judgment for C&H on all claims.
 
 
 9
 I. The Age and Sex Discrimination Claims.
 
 
 10
 To overcome defendants' motion for summary judgment, plaintiffs must offer facts sufficient to establish a prima facie case. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The burden of establishing a prima facie case is not onerous, Burdine, supra, at 1094; and the elements essential to it should not be reduced to rigidly applied formulae. McDonnell Douglas, supra, 411 U.S. at 802, n.13, 93 S.Ct. at 1824 n.13. The plaintiff is required only to eliminate the most common reasons for her rejection, or, as in this case, discharge. Burdine, supra.
 
 
 11
 It was undisputed that Meyer was in a class protected against employment discrimination, and that she was discharged despite the fact that she had performed her tasks in a manner satisfactory to C&H for more than 18 years prior to the incident that precipitated her discharge. Moreover, it does not appear that Meyer was discharged because C&H contemplated eliminating her duties from its payroll. We hold that, having established these facts, Meyer had satisfied her initial burden and raised a rebuttable presumption that C&H unlawfully discriminated against her.
 
 
 12
 It was therefore incumbent upon C&H to rebut that presumption by producing evidence that Meyer was discharged for a legitimate, nondiscriminatory reason. Id. On this record, such a reason is immediately apparent: C&H obviously concluded that Meyer's conduct had rendered useless her further services as an assistant in C&H's Personnel Department. In fact, C&H was genuinely concerned that Meyer's memos would expose it to action by the EEOC unless it took action appropriate to indicate that Meyer's sentiments were not shared by the Company. C&H thus tendered a sufficient nondiscriminatory basis for its action.
 
 
 13
 Since C&H met its burden of production, Meyer's opportunity lay in proving, if she could, that her memos and the reaction to them were not the true reason for her discharge. Id. at 1095. Here lies the heart of Meyer's case. Citing a number of incidents in which male employees made racist remarks which evoked little or no discipline from management, Meyer argues that she was disciplined more severely for comparable conduct because of her gender.
 
 
 14
 The first of these incidents involved Dennis Horgan, now Credit manager, who once is said to have shouted of his secretary that she "thinks like a God damn Japanese." Horgan, Meyer claims, was never punished. Eugene Doyle refused to hire a Chinese woman, stating that, "Chinese can't learn anything." Robert Del Ponte, head of the Data Processing Department, refused to accept a black employee, stating that "when there was more than one black they indulged in a great deal of what he called black humor that the other members of the department didn't understand." And Mr. Marshall, past president of C&H, refused to hire a minority chauffeur because he thought his wife would be afraid of him. None of these men, according to plaintiffs, received more than a mild reprimand.
 
 
 15
 Deplorable though they be, these allegations do not raise a triable issue of fact as to whether C&H's proffered reason for Meyer's discharge was mere pretext. As the district court stated:
 
 
 16
 Meyer was not discharged for making derogatory comments about minorities. She was discharged because the derogatory comments she made had such an adverse impact on minority employees that they impaired her usefulness in her sensitive duties in the Personnel Department and, coming from her, reflected unfavorably on C&H's policies toward its minority employees.
 
 
 17
 Nothing in the affidavits or other evidence offered by Meyer suggests that the remarks of Horgan, Doyle or Del Ponte provoked anything comparable to the vigorous reaction attending Meyer's memos. Further, all evidence in the record indicates that none of the statements brought forward by Meyer were ever made known to Nagle, the person responsible for her discharge. In short, the incidents cited by Meyer are not such parallels to her case as to raise a genuine issue of pretext. Thus, Meyer failed to allege triable issues of fact as to an essential element of her claim. Summary judgment for C&H was therefore appropriate.
 
 
 18
 II. Other Claims.
 
 
 19
 Meyer brought several other claims under federal law; the district court granted summary judgment for C&H as to each. We have reviewed the record and find this disposition to have been correct.
 
 
 20
 The district court also entered summary judgment against Meyer on her pendent state claims. Meyer contends that this was improper in light of the fact that the court had dismissed the federal claims upon which pendent jurisdiction originally had been based. She argues that, in this situation, the court ought to have dismissed the state claims without prejudice.
 
 
 21
 Federal courts should not reach out unnecessarily to decide state law claims. United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). However, "the question is one of discretion, not one of power." State of Arizona v. Cook Paint & Varnish Co., 541 F.2d 226, 227 (9th Cir. 1976). The Supreme Court has stated:
 
 
 22
 We are not willing to defeat the common sense policy of pendent jurisdiction the conservation of judicial energy and the avoidance of multiplicity of litigation by a conceptual approach that would require jurisdiction over the primary claim at all stages as a prerequisite to resolution of the pendent claim.
 
 
 23
 Rosado v. Wyman, 397 U.S. 397, 405, 90 S.Ct. 1207, 1214, 25 L.Ed.2d 442 (1970). Where, as here, the court and the litigants had expended considerable time on the pendent claims before the federal claim was dismissed, the district court did not abuse its discretion by resolving the pendent claims. Cook Paint, supra, at 227-28.
 
 
 24
 On the merits, we find that the district court's entry of summary judgment on the state claims was proper.
 
 
 25
 The judgment of the district court is AFFIRMED.
 
 
 
 *
 Hon. Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation
 
 
 [1]
 The deletions appear in the memorandum